## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**-vs-**                                              **Case No.  6:06-cr-210-Orl-31KRS**

**MARIA I. GONZALEZ DE ARIAS**
**MIGUEL HUMBERTO BELTRAN**
**JAVIER MARTINEZ, SR.**

_____

## ORDER

This matter comes before the Court on a Joint Motion to Suppress (Doc. 69) filed by

Defendants Maria Gonzales De Arias ("De Arias"), Miguel Humberto Beltran ("Beltran") and Javier

Martinez, Sr. ("Martinez, Sr.")[1] and the Government's Response thereto (Doc. 73). This Court held

an evidentiary hearing on this matter on April 25 and 26, 2007.[2]  Following the hearing, both parties

submitted supplemental briefs (Docs. 104 and 105).[3]

**I. Facts**

The Drug Enforcement Agency Task Force for the Middle District of Florida (the "Task

Force") began surveillance of a residence located at 2259 South Spring Garden Ranch Road in Deland,

Florida (the "Residence") on or about  September 20, 2006, pursuant to a tip it received that drug

_____

[1]Martinez Sr. was not a party to the original motion, however he joined in the motion and
adopted its arguments on February 6, 2007. (Doc. 77).

[2]The transcript of this hearing is filed at Docs. 101 and 102 and will be cited herein as "TR".

[3]The Government submitted its supplemental brief (Doc. 105) on the morning of May 26,
2007, one day after the deadline imposed by this Court. Defendants then filed an objection to this
untimely filing. (Doc. 106) Defendants' objection is well founded, however, in the interest of judicial
efficiency, the Court has decided not to strike the document and will consider the arguments therein.

activity was taking place at that location. TR at 9-10.  The lead case agent on this investigation was Agent Locher. *Id.* at 77, 139.  To conduct the surveillance the Task Force installed a "pole camera" on a nearby utility pole, which provided a constant video feed that could be viewed on the Agents' laptop computers or on a desktop computer located in the Task Force's office. *Id.* at 11-12. Unfortunately, the pole camera feed could only be recorded if someone was sitting at the desktop computer in the office, so the majority of the surveillance was not preserved. *Id.* at 196-97.

This video surveillance continued until November 8, 2006, when Agent Locher followed a Red Dodge Intrepid (the "Intrepid") from the Residence and conducted a traffic stop of that vehicle on I-4 in Seminole County. *Id.* at 21.  The vehicle was driven by Andrew Anthony Jenkins ("Jenkins") who had been observed several times at the Residence in the previous months. *Id.* at 23. On that day, Locher observed Jenkins leave the Residence in the Intrepid at around noon and return to the Residence at 3:00 p.m. *Id.* at 23-24. Shortly thereafter a Ford Expedition, driven by Martinez Sr., pulled into the driveway and parked next to the Intrepid. *Id.* at 24-26. The two men spoke in the driveway and then proceeded into the Residence. *Id.* at 26.  Five to ten minutes later, the men exited the Residence, and Martinez was carrying an object in his hand. *Id.* at 26, 145, 168-69. The men went to the rear door of the Intrepid, and Jenkins was seen opening the door and removing a child seat from the car. *Id.* at 169. Then, one of the men was seen reaching into the back of the Intrepid "fooling around with the seat" and lifting it up. *Id.* at 27, 145, 183. Next, both men went to the trunks of the vehicles. *Id.* at 28. Martinez Sr. removed items from the trunk of the Expedition and Jenkins put them into the Intrepid, including a baby swing, baby seat, a box and a blue tarp. *Id.* at 28-30, 146, 167, 168. Agent Poncharik testified that he believes additional unknown items were also placed in the back seat of the Intrepid. *Id.* at 199.

Jenkins then left the Residence in the Intrepid, and Agents Locher, Randall and Poncharik began to follow him. *Id.* at 31, 146-47.  Jenkins made two u-turns before getting on I-4 Westbound, which the Agents perceived to be "counter-surveillance maneuvers", but were later excused as simple mistakes because Jenkins was unfamiliar with the area. *Id.* at 31-32, 147. After following Jenkins for several miles, at approximately 4:20 p.m., Locher decided to pull him over for driving ten miles over the speed limit and driving with a suspended license. *Id.* at 33-34.

Locher asked Jenkins for his license and registration, and asked if Jenkins would consent to a search of the car. *Id.* at 33, 35, 124. Jenkins handed over his license but refused to consent to the search, saying that the car belonged to his cousin. *Id.* at 33, 35, 124. Locher instructed Jenkins to get out of the vehicle, put handcuffs on him and told him to sit on the grass in the median of I-4. *Id.* at 34, 124. Locher then called for a K-9 Officer, who arrived at approximately 4:45 p.m. and walked a drug dog around the outside of the Intrepid. *Id.* at 34-35, 149. The dog alerted to the rear of the vehicle. *Id.* at 35. At this time Locher placed Jenkins in the back seat of a Florida Highway Patrol ("FHP") vehicle.[4] *Id.* at 36. Agents Locher and  Poncharik then conducted a search of the Intrepid. *Id.* at 38. The back seat was searched twice before the Agents located 4 bricks of cocaine under the rear passenger seat of the vehicle. *Id.* at 37-38. Upon making this discovery, Locher called Assistant United States Attorney Rick Jancha ("AUSA Jancha") and informed him of the situation. *Id.* at 43. AUSA Jancha instructed Locher to apply for a state warrant to search the Residence, and it was decided that

---

[4]The Agents testified that a Trooper employed by the FHP voluntarily stopped to assist them in the traffic stop. None of the Agents knew the name of this Trooper. *Id.* at 36, 184.

Poncharik would obtain the warrant because he works for the Volusia County Sheriff's Office and the Residence is located in Volusia County.[5] *Id.* at 43, 78.

Jenkins testified that, at approximately 5:30 p.m., his cell phone began ringing while he was in the Trooper's car, and that he told the Trooper it was probably his girlfriend calling. *Id.* at 126-27, 136. The Trooper then informed Poncharik that Jenkins had a cell phone in his possession. *Id.* at 41, 77, 152, 184-85, 187-88. Poncharik relayed the information to Locher, who immediately ran over to the FHP vehicle. *Id.* at 41, 152. Locher and Poncharik testified that Jenkins had a cell phone open in his right hand and was manipulating it. *Id.* at 41, 186-87. Locher took the phone away from Jenkins, patted him down again, and confiscated a second phone and his wallet. *Id.* at 41. Locher testified that he believed that Jenkins had been making a phone call, and may have called the Residence to alert them about his arrest.[6] *Id.* at 42.

The Government alleges that it can prove that Jenkins used his cell phone to alert the occupants of the Residence while he was in custody through cell phone records, submitted by the Government with its supplemental brief.[7] (Docs. 105-2 and 105-3). Not only were these records submitted late and without foundation or authentication, they are wholly unpersuasive. First, the Government alleges that Jenkins was in possession of a phone corresponding with the number 941-301-5328. (Doc. 105-2 at 1). The records submitted regarding that phone indicate that the phone was

---

[5]Locher, on the other hand, works for the City of Sanford Police Department. *Id.* at 7.

[6]Locher made no effort to check the cell phone's call log to ascertain whether any such calls were in fact made. *Id.* at 76. It is difficult for this Court to believe that Jenkins could have taken a cell phone out of his pocket, opened it up, and dialed a number while seated in the backseat of an occupied FHP vehicle and handcuffed behind his back.

[7]Defendants have also objected to the submission of these records. (Doc. 106).

in use almost constantly from 5:16 p.m. on November 8, 2006, until 6:03 p.m. (Doc. 105-2 at 2), which means that Jenkins was on the phone for over 45 minutes, while in handcuffs, without anybody noticing. Furthermore, the records indicate that this phone belongs to Javier Ramirez, not Jenkins. (Doc. 105-2 at 1). The Government has submitted no evidence to indicate that Jenkins was in possession of this phone at the time of his arrest. In light of these inconsistencies, the Court finds that this "newly discovered evidence" is not credible.

Furthermore, the Court cannot fathom any reason why Jenkins would testify dishonestly about his use of the phone, as it is in his best interest to be truthful with the Court so that he may receive credit for substantial assistance at his sentencing.  Finally, it appears obvious from the facts of the case that Jenkins did not alert anybody at the Residence that he had been arrested, because nobody fled or attempted to conceal any evidence within the next two hours. Instead, the occupants seemed to be genuinely surprised when the Agents showed up at the Residence. Therefore, this Court finds the testimony of Agents Poncharik and Locher regarding Jenkins' use of a cell phone while he was in custody to be incredible.

In any event, after taking the phones away from Jenkins, Locher called his supervisor, Agent Rousseau, and informed him that Jenkins had been using his cell phone and may have tipped off the occupants of the Residence. TR at 42. Rousseau then suggested that the Agents conduct a "knock and talk" prior to obtaining a warrant. *Id.* Pursuant to Rousseau's orders, several Agents met in the parking lot of a Publix located near the Residence at approximately 6:30 p.m. to prepare for the knock and talk. *Id.* at 44, 154-55, 208.

While in the Publix parking lot, Agents Poncharik, Randall and Brown informed the other Agents of the situation. *Id.* at 210, 231, 245-46. A plan was formulated that a group of approximately

eight law enforcement officers would proceed to the Residence, knock on the door and try to obtain the occupants' cooperation, secure the Residence, and then get a search warrant. *Id.* at 172-73, 192, 201, 210, 214. Agent Aponte was assigned the task of knocking on the front door because he speaks fluent Spanish. *Id*. at 231, 241. Agents Brown and Aponte testified that, regardless of the response to the knock, the Agents planned to enter and "secure" the Residence and its occupants, prior to getting a search warrant. *Id.* at 210-11, 246.

      At 7:22 p.m. Aponte, accompanied by Poncharik, knocked on the door of the Residence with his flashlight and yelled "Police! Open the door!" in both English and Spanish. *Id.* at 160, 214, 218, 242, 247. A man inside the house replied "No!" and a commotion ensued inside the Residence, with people running from room to room. *Id*. at 160, 216, 242. Kathleen Maker ("Maker") ran out the back door of the house and was stopped by Agent Brown. *Id*. at 214-15. Brown instructed Maker to put up her hands and get down on the ground. *Id*. at 215. Brown then left Maker with another agent and he, followed closely by Agent Randall, entered the Residence through the back door. *Id*. at 218-19. Brown then went to the front door of the Residence and unlocked it so other Agents could enter. *Id.* at 243. The Agents conducted a protective sweep of the Residence and the three Defendants were found inside. *Id.* at 243-44. The Defendants, along with Maker, were handcuffed and brought into the living room. *Id*. at 162, 221-22, 243-44. For approximately the next four hours they were "secured" in this manner, unable to leave and being watched by agents. *Id*. at 162, 244-45, 247-48. During the protective sweep of the Residence the Agents discovered, in "plain view", a ledger containing information about drug transactions, a scale, a small amount of cocaine base, and several pipes. *Id*. at 195, 232.

Immediately after the Residence was secured, Poncharik and Brown left the scene to obtain a search warrant. *Id.* at 163, 193, 223. Brown was given the task of typing the affidavit while Poncharik relayed to him Locher's basis for probable cause. *Id.* at 223-24. Poncharik then signed the affidavit and took it to Circuit Judge Clayton, who was visiting a friend at a local retail establishment. *Id.* at 163-64. Judge Clayton refused to sign the warrant because it did not contain any specific dates or times with regard to the surveillance. *Id.* at 164, 225. Poncharik called Locher, got the information, and sent Brown to edit the affidavit. *Id.* at 164. Poncharik remained with the Judge, who signed the warrant when Brown returned at approximately 9:30 that evening. *Id.* at 165, 236. For unknown reasons, the warrant was not executed until 11:00 that night. *Id.* at 47.

As a result of the search conducted after obtaining the warrant, the Agents discovered, *inter alia,* approximately 3 kilograms of cocaine in a closet and a large amount of cash wrapped in green cellophane, hidden in the dash of a car in the garage. *Id.* at 50-51; Govt. Exhs. 8 and 5.

## II. Legal Analysis

### A) Exigent Circumstances

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639 (1980). "A warrantless search is allowed, however, where both probable cause and exigent circumstances exist." *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc).

*United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000).

In this case, the Government argues that exigent circumstances and probable cause did exist and therefore the initial entry into the Residence was justified.[8] The Government makes two arguments

---

[8]It is worth noting that the Government made no argument that the initial entry into the Residence was justified by exigency until submitting its supplemental brief, a month after the hearing.

for exigency, neither of which have merit. First, the Government argues that the Agents had reason to fear that evidence was being destroyed as a result of Jenkins' use of his cell phone after his arrest. *See* TR at 157. First, as noted above, this Court does not believe that the Agents had any reason to suspect that Jenkins made any phone calls. If they had, they certainly could have checked the phone log, or, at the very least, instructed someone to keep an eye on the residence, either in person or on the video feed, to watch for suspicious activity. Even assuming the agents did see Jenkins holding and manipulating a cell phone, at best, any exigency created by this alleged phone call was stale when the Agents arrived at the Residence about 2 hours later.[9] TR at 189. Furthermore, exigency must be supported by facts[10], and Agent Locher testified that he was not aware of any unusual activity at the Residence between the time of the traffic stop and the time of the knock and talk, and that he did not know if anyone at the Residence had been "tipped off." TR at 100. None of the other Agents provided any evidence to the contrary.

---

[9]"The exigent circumstances doctrine applies only when the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Satterfield*, 743 F.2d 827, 844 (11th Cir. 1984). In light of the fact that the Agents did not even attempt to "secure" the Residence for almost 2 hours, there can be no legitimate argument that there was any such "urgent need for immediate action" in this case.

[10]

Mere speculation about [the occupants'] suspicions, without any factual support, is not enough to overcome the warrant requirement. *See Lynch*, 934 F.2d at 1233; *cf. United States v. Salgado*, 807 F.2d 603, 609 (7th Cir. 1986) ("A mere possibility that evidence will be destroyed … is not enough. Otherwise the requirement of a warrant would have little meaning in the investigation of drug crimes.").

*Santa*, 236 F.3d at 671.

Second, the Government argues that exigent circumstances existed after the officers knocked on the door of the Residence and heard the occupants running around inside the house. This argument is without merit. Law enforcement agents cannot simply create exigencies in order to avoid the warrant requirement.[11]  Therefore, the presumption of unreasonableness has not been rebutted and the initial entry of the Residence is deemed illegal as a matter of law.

*B) Inevitable Discovery*

Next, the Government argues that anything discovered as a result of the illegal entry should be admissible under the doctrine of inevitable discovery.

> The elements of the inevitable discovery rule in this circuit were set forth in a former Fifth Circuit case, *United States v. Brookins*, 614 F.2d 1037 (5th Cir. 1980). To qualify for admissibility, there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct. *Id*. at 1042 n. 2, 1048. *See also Roper*, 681 F.2d at 1358.

*United States v. Satterfield*, 743 F.2d 827, 846 (11th Cir. 1984).

---

[11]

This court has held that "a warrantless search is illegal when police possess probable cause but instead of obtaining a warrant create exigent circumstances." *Tobin*, 923 F.2d at 1511 (*citing United States v. Scheffer*, 463 F.2d 567, 575 (5th Cir. 1972), hold that where customs agents planned a cocaine delivery and could have controlled the time at which it took place, the agents had no valid excuse for failing to obtain a search warrant,) and *United States v. Munoz-Guerra*, 788 F.2d 295, 298 (5th Cir. 1986) (holding that where agents can get a warrant instead of revealing themselves and making immediate entry a foregone necessity, a warrantless search must be deemed unreasonable)); see also *United States v. Duchi*, 906 F.2d 1278, 1285 (8th Cir. 1990) (holding that evidence must be suppressed where the police created the exigency that the suspect would open a tampered package and destroy the evidence therein).

*Santa*, 236 F.3d at 671.

In this case, the Agents did not make any attempt to obtain a warrant prior to the illegal entry. In its supplemental brief, the Government argues that the Agents were in the process of obtaining a warrant when the initial entry was made because they had already made phone calls to arrange for the warrant. (Doc 105 at 19). This argument fails, however, because the testimony at the hearing was clear that the Agents decided to do the knock and talk prior to seeking a warrant, and in fact, in hopes that they would get compliance from the residents and not have to get a warrant at all. TR at 79. Furthermore, the officer assigned to secure the warrant was admittedly present for the initial entry into the Residence. *Id*. at 158, 193. The fact that the Agents discussed the option of obtaining a warrant prior to making the illegal entry is not sufficient to show "active pursuit" of a warrant. Therefore, the Government has failed to satisfy the second prong of the inevitable discovery rule and the items found during the "protective sweep" are not admissible.

*C) Independent Source*

Finally, the Government argues that the evidence discovered after the warrant was obtained is admissible under the independent source doctrine.

> [W]hile the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied. So long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession) there is no reason why the independent source doctrine should not apply.

> The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

*Murray v. United States*, 487 U.S. 533, 542 (1988).

Therefore, to determine whether the evidence is admissible under the independent source doctrine, this Court must more closely examine the warrant.

### 1. Was the warrant influenced by the illegal entry?

In this case, the warrant affidavit itself does not make any mention of the evidence discovered in plain view at the Residence. It does however indicate that the Residence was "secured" at 7:22 p.m. (Doc. 69-2 at 5). Agent Poncharik testified that he did not tell Judge Clayton about anything found inside the Residence as a result of the initial entry:

> Q.  Did you tell the magistrate when you got – or the judge, when you got to him with your affidavit, that you had already been in the house, secured it and arrested the occupants?
> A.  I didn't tell him we arrested the occupants.  I told him we were in the house, secured the occupants, yes.  He knew the house had been secured.
> Q.  Did you tell him what the circumstances were which justified your going into the house?
> A.  Yes.
> Q.  What did you tell him?
> A.  I told him that we approached the house, knocked on the door, and people fled out the back of the house, and we secured the residence.

TR at 193-94.

> THE COURT:  Did you tell the judge that you had already confirmed that there were drugs in the house?
> THE WITNESS:  No, sir, I don't believe I ever told him that.  I explained to the judge that we – the house was secured, the occupants were secured pending the signing of the search warrant, bringing the search warrant over.  I don't think I went into any specifics where anything was found in plain view or anything at that point.
> THE COURT:  And after you left the scene in an effort to get the warrant, you talked to Agent Locher over the phone?
> THE WITNESS:  Yes.
> THE COURT:  Did he tell you anything more about what was found in the house?
> THE WITNESS:  No.  I don't believe so, no.

*Id* at 195-96. Therefore, there is no evidence that the Judge's decision to grant the warrant was influenced by the illegal entry.

Agent Locher did make a statement at the hearing that suggests that the warrant would not have been sought if the occupants gave consent to search the Residence.[12] However, this makes logical sense because if the Agents had consent, they would not have needed a warrant. Furthermore, Agent Poncharik's testimony indicates that he had always intended to get a warrant, even if he did not do so until after the illegal entry. The Agents believed that they had probable cause for a warrant after the traffic stop, and did not use any evidence obtained thereafter in obtaining the warrant. TR at 91. Therefore, the information gained from the illegal entry also did not affect the decision to seek the warrant.

### 2. Was the warrant supported by probable cause?

A search conducted pursuant to a warrant that is not valid is a constitutional violation in itself, and therefore would not be considered a legitimate independent source. In this case, Defendants argue (1) that the warrant affidavit contains material omissions and falsehoods and (2) that the affidavit was not supported by probable cause on its face.

#### a) Material Omissions and Falsehoods

In challenging a warrant affidavit, a defendant must show by a preponderance of the evidence that the affiant exhibited a reckless disregard for the truth or made deliberately false statements, and that the affidavit, absent those false statements, did not establish probable cause. *United States v. Novaton*, 271 F.3d 968, 986 (11th Cir. 2001).

---

[12]

LOCHER: Correct. We went there debating whether to just get the warrant or to go do the knock and talk. We decided – I guess they decided to do the knock and talk first; and if they wouldn't give consent, then he was going to go right for the search warrant.

TR at 79.

The Defendants allege that

[t]he warrant affidavit contains several falsehoods and omissions intended to deceive the magistrate and without which probable cause was surely lacking. It stated:

**"A search of the interior of the vehicle [driven by Jenkins] by TFA Poncharik revealed four, black, taped wrapped packages of suspected cocaine, concealed under the rear seat."**

(Exhibit 3, par.7). It also states that earlier that day:

**"Javier Martinez was observed handing Andrew Jenkins several unknown items. Andrew Jenkins was observed lifting the rear seat of the vehicle and placing the unknown objects under the seat in an attempt to conceal them."**

(*Id.* par. 4). The affidavit clearly intended to link the objects Jenkins received from Martinez and placed in the vehicle to the objects subsequently field-tested as cocaine:

**"Said packages were located in the same area as those observed by DEA Agents, while conducting surveillance. After finding the four, black, taped wrapped packages, TFA Locher conducted a field test of the contents using a NIC test kit. Said test revealed a positive reaction for cocaine."**

(*Id.* par. 7, par. 8). Finally, the affidavit omits the source of the objects Martinez handed to Jenkins; the transfer is simply described after it is noted that the two had exited the residence (*Id.* par. 4) – implying that the objects placed under the rear seat had come from the house.

The testimony at the hearing established that contrary to the warrant the only objects agents actually observe pass from Martinez to Jenkins were not unidentified – nor were they black taped packages. . . . Poncharik conceded he could not see what it was Martinez had brought out of the house or what had happened to it and did not see it placed into the Intrepid . . .

Doc. 104 at 23-4.

The Agents testimony at the hearing on this subject was quite convoluted. It is this Court's

opinion that the Agents saw Martinez, Sr. come out of the Residence with something in his hand,

but that they could not tell what it was.[13] None of the Agents were able to determine what happened to that object between the time that Martinez, Sr. brought it out of the Residence and the time Jenkins drove away. Therefore, it appears that the Agents merely assumed it was placed into Jenkins' car. Defendants argue that the affidavit should have revealed that some of the items placed in the Intrepid were known to the Agents, and were innocent, such as a blue tarp, a baby swing and a baby seat. Defendants also argue that none of the Agents witnessed any unidentified items being placed in the Intrepid, and that none of the Agents witnessed *anything* being placed in the back seat, where the cocaine was found. However, Agent Poncharik made it clear that he did see items being placed in the Intrepid that he could not identify. TR at 178, 199. However, it is true that no agent actually witnessed any items being placed in the Intrepid's back seat, because their view was blocked. Instead, they only saw Jenkins remove a baby seat and pull up the rear car seat.

There are ultimately two factual possibilities here: either Jenkins had the drugs in the car when he arrived at the Residence on November 8, 2006, or Jenkins received the drugs while he was at the Residence. In order to obtain a search warrant for the Residence, the Agents knew that they had to establish a nexus between the drugs and the Residence. They attempted to do this (1) by including the history of the residence in the affidavit (i.e. the informant's tip and the suspicious traffic over the last few months), and (2) by implying that something was placed in the back seat of the Intrepid (where the drugs were found) while Jenkins was at the Residence that day.

---

[13]This Court finds it curious that the affidavit omits the fact that the agents saw Martinez, Sr. carry an object out of the Residence, as that would have helped provide a nexus between the Residence and the vehicle. However, had this fact been included in the affidavit it would have only further supported a finding of probable cause, and therefore is not a material omission.

It is clear that the statement in the affidavit indicating that "Andrew Jenkins was observed lifting the rear seat of the vehicle and placing the unknown objects under the seat in an attempt to conceal them" was false. Jenkins was observed lifting the rear seat, and placing items in the trunk, but he was not observed placing items under the rear seat. The Agents were careless in many ways during this investigation. Not only did they make self-serving assumptions, but they omitted facts from the affidavit that would have supported their argument for probable cause. While the Defendants have shown that the affidavit did not tell the whole story, and contained at least one false statement, they have not demonstrated a reckless disregard for the truth.

*b) Probable Cause*

Finally, Defendants argue that the warrant was not supported by probable cause on its face. A Judge's decision to issue a warrant is afforded great deference by a reviewing court. *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991). In this case, the warrant affidavit indicated that the Agents had information from an informant, corroborated by suspicious activity at the Residence, that they had recovered drugs from a vehicle seen leaving the Residence, and that the Agents witnessed suspicious activity in and around the vehicle while it was at the Residence, immediately prior to discovering the drugs. "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). In this case, the warrant affidavit provided the Judge with sufficient probable cause on which to issue a warrant. Therefore, the warrant to search the Residence was valid.

**III. Conclusion**

The Agents' decision to enter and "secure" the Residence before obtaining a warrant is troubling. If the Agents truly were concerned about the destruction of evidence or departure of the occupants, they could have set up surveillance until a warrant was obtained. The Agents' argument that there was no good place to observe the Residence from is both legally insufficient and factually unbelievable. TR at 190-91; *See Santa,* 236 F.3d at 670 ("Without more, an inability to maintain effective surveillance will not suffice to overcome the warrant requirement."). Furthermore, the excuse is not credible in this case because the Agents had been conducting electronic surveillance of the Residence for months without detection. Certainly, an agent could have been assigned to monitor the video feed after Jenkins' arrest. *See* TR at 96-7. Nevertheless, the independent source doctrine as enunciated by the United States Supreme Court in *Murray, supra,* serves to legitimize this otherwise unlawful entry, and this Court is bound to follow that precedent.

However, while obligated to follow *Murray*, the Court need not agree with it. In order to soften the Fourth Amendment loophole created by this precedent, the Supreme Court said:

> An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises, both seen and unseen, since his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it.

*Murray*, 487 U.S. at 540(internal citation omitted).

In other words, "don't worry, the police won't really take advantage of this tactic." This Court disagrees. As a practical matter, under this precedent, there is very little incentive for the

police to obtain a warrant first, and risk the possibility that intervening circumstances will

jeopardize their discovery of contraband. Rather, if the police have (or believe they have) probable

cause for a search, there is little risk in searching first and obtaining a warrant later, as long as the

"tainted" evidence is not used in the affidavit. Given the deference due a magistrate's issuance of a

warrant, a risk/reward analysis clearly supports a policy of searching first, and obtaining a warrant

later. And, if the warrant is not obtained, the officers are likely immune from suit for violating the

homeowner's constitutional rights, because *Murray* makes their conduct objectively reasonable.

This case is a classic example that warrantless entry is not the least bit "foolish", but rather is a

logical application of the *Murray* precedent.[14] Nonetheless, it is

> **ORDERED** that the Defendants' Motion to Suppress (Doc. 69) is **DENIED**.

> **DONE** and **ORDERED** in Chambers in Orlando, Florida on June 4, 2007.

Copies furnished to:

United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
MARIA I. GONZALEZ DE ARIAS
MIGUEL HUMBERTO BELTRAN
JAVIER MARTINEZ
Andrew Anthony Jenkins

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

---

[14]This Court is not alone in its criticism of the development of the independent source doctrine. *See, e.g.,* Jeffery L. Kirchmeier, Casenote, Murray v. United States*: Legally Rediscovering Illegally Discovered Evidence*, 39 Case W. Res. 641 (1989); Craig M. Bradley, Murray v. United States*: The Bell Tolls for the Search Warrant Requirement*, 64 Ind. L.J. 907 (1989); James A. Adams, *Crime and Punishment: A System in Collapse: Search and Seizure As Seen By Supreme Court Justices: Are They Serious or Is This Just Judicial Humor?*, 12 St. Louis U. Pub. L. Rev. 413 (1993); *Murray,* 487 U.S. at 544 (Marshall, J dissenting).